No. 16-1403

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

————————————————

HOCKEYLINE, INC.,

Appellant,

vs.

STATS LLC,

Appellee.

————————————————

On Appeal From the United States Patent and Trademark Office
Before The Patent Trial and Appeal Board
Case IPR2014-00510

————————————————

**APPELLANT'S OPENING BRIEF**

————————————————

ROBERT E. FREITAS
JASON S. ANGELL
DANIEL J. WEINBERG
FREITAS ANGELL & WEINBERG LLP
350 Marine Parkway, Suite 200
Redwood Shores, California  94065
Telephone:   (650) 593-6300
Facsimile:    (650) 593-6301

Attorneys for Appellant
Hockeyline, Inc.

## CERTIFICATE OF INTEREST

Counsel for Appellant Hockeyline, Inc. ("Hockeyline") certifies the following:

1.      The full name of every party or amicus represented by me is:

Hockeyline, Inc.

2.      The name of the real party in interest represented by me is:

N/A

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Robert E. Freitas
Jason S. Angell
Daniel J. Weinberg
FREITAS ANGELL &WEINBERG LLP
350 Marine Parkway, Suite 200
Redwood Shores, CA 94065
Telephone: (650) 593-6300
Facsimile: (650) 593-6301
rfreitas@fawlaw.com
jangell@fawlaw.com
dweinberg@fawlaw.com

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ...................................................................1

JURISDICTIONAL STATEMENT ......................................................................1

STATEMENT OF ISSUES ...................................................................................1

STATEMENT OF THE CASE...............................................................................2

STATEMENT OF FACTS .....................................................................................3

SUMMARY OF THE ARGUMENT ....................................................................6

ARGUMENT ........................................................................................................7

I.    STANDARD OF REVIEW ..........................................................................7

II.   HAMEEN-ANTTILA AND STATS FOOTBALL DO NOT
      TRANSFER "STATISTICAL INFORMATION BASED ON SUCH
      INPUTTED DATA." ......................................................................................8

      A.    The Board Erred In Conflating "Data Related To Events Of
            Said Sports Game" And "Statistical Information Based On
            Such Inputted Data." ............................................................................8

      B.    Hameen-Anttila and STATS Football Do Not Transfer
            "Statistical Information Based On Such Inputted Data"...................17

III.  HAMEEN-ANTTILA AND STATS FOOTBALL DO NOT
      DISCLOSE USER-CUSTOMIZABLE SCREENS ....................................22

      A.    "Customized By The User" Requires User Modification Of
            Screens Displayed By The Device .....................................................23

      B.    The Board's Invalidity Determination Cannot Stand Under A
            Proper Construction Of "Customized By The User." ........................26

            1.    Hameen-Anttila Does Not Disclose User-Customizable
                  Screens ......................................................................................26

            2.    STATS Football Does Not Disclose User-Customizable
                  Screens ......................................................................................29

# TABLE OF CONTENTS
(continued)

**Page**

C.    Hockeyline's Interpretation Is Correct ...............................................31

IV.    CONCLUSION ............................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*ACTV, Inc. v. Walt Disney Co.*,
  346 F.3d 1082 (Fed. Cir. 2003) ...................................................................11, 14

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
  448 F.3d 1324 n.3 (Fed.Cir.2006) ..............................................................12, 13

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
  616 F.3d 1249 (Fed. Cir. 2010) ...........................................................................17

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH*,
  224 F.3d 1308 (Fed.Cir.2000) .......................................................................13, 25

*Consol. Edison Co. of N.Y. v. NLRB*,
  *305 U.S. 197, 229 (1938)* ......................................................................................8

*Cuozzo Speed Techs., LLC v. Lee*,
  136 S. Ct. 890 (2016) ...........................................................................................10

*In re Cuozzo Speed Techs., LLC*,
  793 F.3d 1268 (Fed. Cir. 2015) ...........................................................................10

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
  527 F.3d 1379 (Fed. Cir. 2008) .................................................................6, 12, 25

*Laitram Corp. v. NEC Corp.*,
  163 F.3d 1342 (Fed. Cir. 1998) ...........................................................................25

*Microsoft Corp. v. Proxyconn, Inc.*,
  789 F.3d 1292 (Fed. Cir. 2015) ...........................................................................10

*In re Morsa*,
  713 F.3d 104 (Fed. Cir. 2013) ...............................................................................7

*Novosteel SA v. U.S., Bethlehem Steel Corp.*,
  284 F.3d 1261 (Fed. Cir. 2002) .....................................................................38, 41

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ...................................................................*passim*

*Renishaw PLC v. Marposs Societa' per Azioni,*
    158 F.3d 1243 1248 (Fed.Cir.1998) .................................................17

*In re Skvorecz,*
    580 F.3d 1262 (Fed. Cir. 2009) ................................................10, 24

*Teva Pharm. USA, Inc. v. Sandoz, Inc.,*
    135 S. Ct. 831 (2015).........................................................................7

*Thorner v. Sony Computer Entm't Am. LLC,*
    669 F.3d 1362 (Fed. Cir. 2012) .......................................................10

*Trivascular, Inc. v. Samuels,*
    812 F.3d 1056 (Fed. Cir. 2016) .........................................................8

*Universal Remote Control, Inc. v. Universal Electronics, Inc.,*
    2014 WL 2995051 (June 30, 2014) .......................................38, 39, 41

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576  (Fed.Cir.1996) ...................................................10, 11

## Federal Statutes

28 U.S.C. § 1295(a)(4)(A) .......................................................................1

35 U.S.C. § 6 ..........................................................................................1

35 U.S.C. § 102(b) ..............................................................................1, 2

35 U.S.C. § 102(e) ..............................................................................1, 2

35 U.S.C. § 103 .......................................................................................3

35 U.S.C. § 329 .......................................................................................1

## Regulations

37 C.F.R. § 42.6 (c)...............................................................................34

37 C.F.R. § 42.100(b) ...........................................................................10

## STATEMENT OF RELATED CASES

United States Patent 6,725,107 B2 ("'107 Patent") is also at issue in the following matter:  *Hockeyline Inc. v. STATS LLC*, C.A. No. 1:13-cv-1446-CM (S.D.N.Y.).  Hockeyline Inc. ("Hockeyline") is aware of no other related cases.

## JURISDICTIONAL STATEMENT

STATS LLC ("STATS") filed a Petition for *Inter Partes* Review of Hockeyline's '107 Patent.  A46.  The Patent Trial and Appeal Board ("Board") had jurisdiction over STATS's petition under 35 U.S.C. § 6.  The Board issued a final written decision on September 15, 2015.  A1-A36.  Hockeyline timely filed its notice of appeal on November 17, 2015.  *See* 35 U.S.C. § 329.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF ISSUES

Whether the Board properly construed Claim 1 of the '107 Patent.

Whether STATS proved that claims 1, 2, 8, 10, 11, 12 and 30 of the '107 Patent are unpatentable as anticipated over United States Patent 7,037,198 under 35 U.S.C. § 102(e).

Whether STATS proved that claims 1, 2, 8, 10, 11, 12 and 30 of the '107 Patent are unpatentable as anticipated over the STATS 1995 Football Scoring Manual under 35 U.S.C. § 102(b).

-1-

## STATEMENT OF THE CASE

On March 27, 2014, STATS filed a Petition for *Inter Partes* Review of claims 1, 2, 8, 10, 11, 12 and 30 of Hockeyline's United States Patent 6,725,107 ("'107 Patent"). On September 25, 2014, the Board instituted *Inter Partes* Review on three grounds: (1) Claims 1, 2, 8, 10-12, and 30 are anticipated by United States Patent 7,037,198 B2 ("Hameen-Anttila"); (2) Claims 1, 2, and 30 are anticipated by the STATS 1995 Football Scoring Manual ("STATS Football");3) Claims 8, 10-12, and 30 are obvious over STATS Football and United States Patent 5,740,549 ("Reilly"). A475 (Institution Decision).

Hockeyline filed its Patent Owner Response on December 12, 2014, A486, accompanied by the declaration of Dr. C. Douglass Locke. A514.

STATS LLC filed a Reply to Hockeyline's Patent Owner Response, A544, accompanied by the Declaration of Anton T. Dahbura. A634.

Oral Hearing was held on May 19, 2015. A1493. On September 15, 2015, the Board issued a Final Written Decision in which it found that STATS had shown by a preponderance of the evidence that (i) claims 1, 2, 8, 10–12, and 30 of the '107 patent are unpatentable as anticipated by Hameen-Anttila pursuant to 35 U.S.C. § 102(e); (ii) claims 1, 2, and 30 are unpatentable as anticipated by STATS Football pursuant to 35 U.S.C. § 102(b); and (iii) claims 8, 10–12, and 30 are

unpatentable as obvious over STATS Football and Reilly pursuant to 35 U.S.C. §

103.  A35.

## STATEMENT OF FACTS

The '107 patent discloses an electronic scorekeeping device designed to

collect in real time data related to events of a sports game, and to transmit

statistical information based on the inputted data to a database.  *See* '107 patent

(A102-A109), Abstract; *see id*. at 1:7-10 ("The present invention relates to an

electronic scorekeeping device for sports games.  The invention also facilitates the

timely collection of sports-related data and the processing and transmission of

related statistics.").

An embodiment of the electronic scorekeeping device, and a system

incorporating the electronic scorekeeping device, is disclosed in Figure 2 of the

'107 patent.



FIGURE 2

At the time of the invention, there were electronic devices used to collect scoring information related to sports games, but there were drawbacks to these devices. *Id*. at 1:24-26. For example, the statistics related to the events of the game were not available to the general public. *Id*. at 1:38-43 ("During the game, the statistics related to the events of the game are only made available to those in attendance. Once the game is over, the statistics compiled by such prior art devices are only available to the operator of the device or to those who obtain a printout from the device, and not to the general public."). Moreover, it was necessary to enter the statistics into a separate system in order to make the statistics publicly available. *Id*. at 1:43-48 ("[S]uch information may be made available following the conclusion of the game. However, this requires an extra step of

further entering the data in a separate system dedicated to the delivery of such information.").

The '107 patent claims an improvement over these conventional scoring devices by providing a single device capable of real-time data collection, statistical computation, and transmission of the statistical information to a database configured to enable the public to access the information as the sports game is played. *Id.* 1:56-61 ("The present invention advantageously provides an electronic scorekeeping device for gathering, calculating and distributing statistical information related to a sports game whereby the information can be transferred in real-time to a central database and may consequently be made concurrently available to the general public.").

Claim 1, the only independent claim at issue, reads as follows:

> 1. An electronic scorekeeping device for gathering, processing and distributing statistical information related to a sports game, comprising:
>
> a processor;
>
> input means coupled to said processor for inputting *data related to events of said sports game* in real-time;
>
> memory means coupled to said processor for storing such inputted data;
>
> display means coupled to said processor for facilitating the entry of such data by a user;
>
> information transfer means for transferring *statistical information based on such inputted data* to a central database via communication means;

> wherein the display means displays a plurality of
> *hierarchical menu-based screens that may be customized*
> *by the user to reflect desired data that is to be gathered*
> *for said sports game*.

'107 Patent at 8:10-27 (emphasis added to indicate terms at issue in this appeal).

## SUMMARY OF THE ARGUMENT

In finding that Hameen-Anttila and STATS Football anticipate Claim 1, the Board incorrectly determined that "statistical information based on such inputted data" was properly construed to include the raw "data related to events of said sports game" input into the device the by user.  The Board's conclusion was contrary to the express language of the claims, and well-established principles of claim construction.  *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) ("different claim terms are presumed to have different meanings").  Under the correct construction, neither Hameen-Anttila nor STATS football transfers "statistical information based on such inputted data" to a central database.

The Board also erred when it construed "screens that may be customized by the user to reflect desired data that is to be gathered for said sports game" as "any action by the user to configure the hierarchical menu-based screen displays to permit desired data to be gathered for one or more sports games."  The Board found that references that permitted a user to navigate a hierarchical screen system by selecting menu options satisfied the "screens that may be customized by the

user" limitation of Claim 1.  Under the proper construction of the claim language, Hameen-Anttila and STATS Football do not disclose devices that provide display screens that "that may be customized by the user to reflect desired data that is to be gathered for said sports game."

The Board's conclusion that Claim 1 is unpatentable as anticipated by Hameen-Anttila and STATS Football depends on the Board's erroneous claim construction, and therefore cannot stand.  The remaining challenged claims of the '107 Patent depend from Claim 1.  The Board's determination that Claims 2, 8, 10, 11, 12 and 30 are unpatentable falls with the rejection of its Claim 1 decision.

## ARGUMENT

## I.    STANDARD OF REVIEW

"The ultimate construction of the claim is a legal conclusion that the appellate court can review de novo."  *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 834 (2015).  If the Board considers matters outside the intrinsic record in interpreting the claims and the Board makes findings on subsidiary facts about extrinsic evidence related to claim construction, "this subsidiary fact finding must be reviewed for clear error on appeal."  *Id*. at 841.

The Board's determination of anticipation is a question of fact reviewed for substantial evidence.  *In re Morsa*, 713 F.3d 104, 109 (Fed. Cir. 2013).  "Substantial evidence 'means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'" *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1061 (Fed. Cir. 2016) (*citing Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).

## II.    HAMEEN-ANTTILA AND STATS FOOTBALL DO NOT TRANSFER "STATISTICAL INFORMATION BASED ON SUCH INPUTTED DATA."

### A.    The Board Erred In Conflating "Data Related To Events Of Said Sports Game" And "Statistical Information Based On Such Inputted Data."

The Board's construction of "statistical information based on said sports game" incorrectly equates "statistical data" with the "data related to events of said sports game" on which the "statistical information" "is based."  Claim 1 distinguishes "data related to events of said sports game," which data are entered into the device by the user, and "statistical information based on said sports game" that the device transmits to a central database.  A set of information that is "based on" other information must be different from the information on which it is based.  In the context of Claim 1, the "data related to said sports game" are used to create "statistical information based on said inputted data" by the handheld sports scoring device into which the data are input.  As explained below, the distinction is important, because the Board found that references that only disclose transmission of "data related to events of said sports game" (but not "statistical information based on said inputted data") to a central server invalidate Claim 1.  The plain

language of Claim 1, and the legal rules that require different terms to be afforded different meanings, demonstrate that the Board's construction is incorrect.

The fifth element of Claim 1 requires an "information transfer means for transferring statistical information based on such inputted data to a central database via communication means." '107 Patent at 8:20-22. The antecedent for "such inputted data" appears in the second element: "input means coupled to said processor for inputting data related to events of said sports game in real-time." *Id.* at 8:14-15.

Claim 1 includes other limitations that reference the real-time game data input by the user, including a "memory means coupled to said processor for storing such inputted data," and a "display means coupled to said processor for facilitating entry of such data by a user." *Id.* at 8:16-19. The only reference to "statistical information based on such inputted data" is in the penultimate element, which requires that the "statistical information based on such inputted data" be transferred by an "information transfer means" "to a central database via communication means." '107 Patent at 8:21-23. The statistical information is "based on" the input data, but it is not the input data. The Board's conclusion that Claim 1 of the '107 patent is anticipated by Hameen-Anttila and STATS Football turned on an erroneous construction of "statistical information based on such inputted data" that

eliminates the distinction between the input data and the statistical information that is "based on" the input data.

The claim construction rules confirming the proper understanding of "statistical information based on such inputted data" are not obscure. Pending the Supreme Court decision in *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268 (Fed. Cir. 2015); *cert. granted sub nom. Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 890 (2016), in *inter partes* review, claim terms in an unexpired patent are given their broadest reasonable interpretation in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b). "That is not to say, however, that the Board may construe claims during *inter partes* review so broadly that its constructions are unreasonable under general claim construction principles. *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015). "'[t]he protocol of giving claims their broadest reasonable interpretation . . . does not include giving claims a legally incorrect interpretation.' *In re Skvorecz*, 580 F.3d 1262, 1267 (Fed. Cir. 2009)."

The words of a claim are given their plain and ordinary meaning as understood by a person of ordinary skill in the art, unless the patentee disavows the full scope of a claim term in the specification. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (*citing Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*) and *Vitronics Corp. v.*

*Conceptronic, Inc.*, 90 F.3d 1576, 1580 (Fed.Cir.1996)).  Claim terms must be understood in the context of the claims in which they appear.  *Phillips*, 415 F.3d at 1314 ("the context in which a term is used in the asserted claim can be highly instructive."); *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms.").

In applying the prior art, the Board erased the distinction in Claim 1 between "data related to events of said sports game in real-time" and "statistical information based on such inputted data."  It is undisputed that Hameen-Anttila transfers to a server via its "information transfer means" only the data that are input by the user into the device.  Final Written Decision at A19 ("Hameen-Anttila discloses that sports game event data is input into an electronic scorekeeping device and transmitted via a communications network to a server while the sports game is ongoing.").  The Board did not assert that Hameen-Anttila discloses the transfer of anything other than data input by the user.

The Board stated that Claim 1 "does not exclude inputted data from 'statistical information' or limit 'statistical information based on such inputted data' only to statistics calculated from the inputted data."  Final Written Decision at p. A20.  The Board's comment is puzzling.  It stated that the statistical

information is not limited "to statistics calculated from the inputted data." The "statistical information" is undoubtedly "statistics." Must it be "calculated from the inputted data?" The simple words of the claim state that it must be "based on" the input data. Can statistical information be "based on," but not "calculated from," input data? That does not seem possible. But even if it is possible for information to be "based on," but not "calculated from," the input data, the statistical information of Claim 1 must be "based on" the input data. Whatever "based on" means, it plainly does not mean "the untransformed input data."

According to the Board, "consistent with the understanding in the art, the '107 patent uses the words 'data,' 'statistics,' 'statistical data,' and 'statistical information' interchangeably and with significant areas of overlap." Final Written Decision at p. A20; *id.* at p. A21 ("The '107 patent, therefore, variously describes 'statistical information,' 'data,' 'statistical data,' and 'game statistics' or 'statistics' as being gathered and input into the scorekeeping device by the user during a sports game."). The Board's assessment was incorrect, and, in any event, aimed at the wrong target.

It has long been established that "different claim terms are presumed to have different meanings." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) (*citing Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed.Cir.2006) ("[T]he use of two terms in a claim

requires that they connote different meanings...."); *CAE Screenplates Inc. v.*
*Heinrich Fiedler GmbH*, 224 F.3d 1308, 1317 (Fed.Cir.2000) ("In the absence of
any evidence to the contrary, we must presume that the use of these different terms
in the claims connotes different meanings.")).  Claim 1 clearly distinguishes
between "data related to events of said sports game in real-time," and "statistical
information" that is "based on such inputted data."  The requirement that the
statistical information be "based on" the data further underscores the distinction
between them.

 "Data related to events of said sports game in real time" are entered through
an input means.  For example, the user enters the fact that Buster Posey hit a home
run when he batted in the first inning.  At some point later, "statistical information
based on such inputted data" are transferred to a central database though a
communications means.  "Based on" Posey's first inning success, his up to date
batting average of .325, his home run total of 20, or his runs batted in total of 87
might be transferred.  It makes no sense to suggest that the '107 patent says that the
user would input Posey's first inning home run and then transfer the fact of
Posey's first inning home run by using different terminology.

 "Data related to events of said sports game" are different from "statistical
information based on such inputted data."  The presumption of a difference
between the two terms applies, and the Board identified no basis on which the

presumption could be overcome.  That "statistical information" might, in the abstract, be said to be data is not enough to do so.

The Board agreed with STATS that the issue was properly framed as whether a person having ordinary skill in the art would perceive a meaningful distinction between "statistics" and "data," as those terms are used in the art.  That is only a part of what must be considered.  "Statistics" (and the actual claim term "statistical information") and "data" are not free-standing in Claim 1, and the terms must be construed according to the context in which they appear.  *Phillips*, 415 F.3d at 1314; *ACTV*, 346 F.3d at 1088.  In Claim 1, "real time" "data related to events of said sports game" are input into the device, and "statistical information based on such inputted data" are transferred by an information transfer means.  Interpreting "statistical information" and "data" in a manner that does not take account of the context of Claim 1 is not consistent with basic claim construction principles.  *Phillips*, 415 F.3d at 1314; *ACTV*, 346 F.3d at 1088.

It is also not true that the '107 patent "variously describes 'statistical information,' 'data,' 'statistical data,' and 'game statistics' or 'statistics' as being gathered and input into the scorekeeping device by the user during a sports game." Final Written Decision at p. A21 (without citation to '107 Patent); *id.* at A4.  There is no mention of the input of "statistical information."  "Statistical information" is consistently used as a distinct term to describe the information that is transferred

-14-

from the device to the server.  *See, e.g.,* 107 Patent at 5:35-39 ("Although the remaining description of this embodiment of the present invention will be described in detail with respect to the game of hockey, it should be noted that data related to other sports may also be recorded, and statistical information can be processed and transmitted using this device."); *id.* at 2:9-42 (describing embodiments in which "data" are input and "statistical information" is subsequently transferred to a database); *id.* at 3: 25-28 ("Information transfer means 112 enables the transfer of statistical information from the electronic scorekeeping device 100 to a central database (not shown in FIG 1) via a communication means.").  "Data" are entered into the device.  *Id.* at 2:57-59 ("Data related to a game being played may be inputted via input means 102 into an electronic scorekeeping device 100.").  Statistical information "based on" the data are transferred.  The two are different.

The Board commented that the preamble of Claim 1 describes "An electronic scorekeeping device for gathering, processing and distributing statistical information related to a sports game."  Final Written Decision at p. A20.  The Board apparently interpreted the preamble as demonstrating that Claim 1 contemplates that "statistical information" may be "gathered" as well as "distributed," and therefore that "data" and "statistics" are used "interchangeably."

That is an extreme route to an attempt to eliminate the distinction between input data and statistical information based on the data in Claim 1.

It is not difficult to understand the preamble in harmony with the distinction drawn between user-input "data related to events of said sports game" and "statistical information based on such inputted data." The preamble does not specify how "statistical information" is gathered. The only other reference in Claim 1 to "gathering" information appears in the last element, which states that the screens may be customized "by the user to reflect desired data that is to be gathered for said sports game." "Statistical information based on such inputted data" may be "gathered" in a device that contains user-inputted sports game data. The statistical information that is gathered and processed may then be "transmitted" to the central database. The preamble does not refer to the statistical information as being gathered by the user, and there is no reason to interpret it that way.

The Board's suggestion that the proper way to ascertain the meaning of these terms is to evaluate whether "statistical information based on such inputted data" somehow excludes "data related to events of said sports game" is not supported by established claim construction principles. Rather than interpreting the terms as they appear in Claim 1, the Board's analysis assumes a result, and then

seeks to see if there is any reason not to get there.  At best, the Board's analysis is backwards.

Even if "statistics" and "data" are used "interchangeably" at times in the specification, that would not provide a basis for ascribing to these different terms the same meaning.  The terms are used to denote different information in Claim 1, and it is the claim that controls, not the specification.  *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Claim construction 'begins and ends in all cases with the actual words of the claim.'") (citing *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed.Cir.1998) ("[T]he resulting claim interpretation must, in the end, accord with the words chosen by the patentee to stake out the boundary of the claimed property.")).

### B. Hameen-Anttila and STATS Football Do Not Transfer "Statistical Information Based On Such Inputted Data"

Hameen-Anttila is entitled "Recording Game Information Into A Server."  It generally describes a system in which game results are input into a mobile device or a terminal, and the inputted game data are then transmitted to a server.  Figure 3 is as follows:



Hameen-Anttila summarizes operation of its invention in the Summary Of Invention as follows:

> According to the present invention, a game result is generated by playing a game such as, for example, golf, ice hockey, football, baseball, and bowling. The game results are input into a mobile terminal input device and then transmitted via the mobile terminal to a central location, i.e., the sport server. The game results may be input by the player himself or may be automatically added to the game server based on results received from a detecting system such as, for example, an automatic scoring device in a bowling alley which detects pins left standing and after each turn and records the result. Alternatively, the game results may be input by a person assigned to input the results of a specific sporting event. The mobile terminal transmits the result to the sport server including the location of the mobile terminal.

Hameen-Anttila at 2:37-51. Hameen-Anttila does not suggest that the "sport data" transferred by the "mobile terminal" to the "sport server" are anything other than the data that the user input into the terminal. In other words, the sport data

transferred by the terminal are noting more than the sport data input by the user, and are not "statistical information based on such inputted data."

STATS Football transfers only "data related to said sports game" input by the user to a server, not "statistical information based on such inputted data." The two are not the same. STATS Football discloses a software program for entering "events of a football game into a computer." STATS Football at p. A202. Data about the football game are entered into a game file by a user in real time as the game progresses. *Id.* The football game event data entered by the user are then transferred via modem to a STATS VAX computer. *Id.* at pp. A202, A206. *See also* Final Written Decision at p. A25. The Board stated, "for the same reasons provided in section II.B.2(d) [regarding Hameen-Anttila], above, we conclude that 'transferring statistical information based on such inputted data' to a central database, as described and claimed in the '107 patent, does not exclude transfer of inputted data." Final Written Decision at p. A28. But there is a clear difference between the "inputted data" and the "statistical information" that is "based on" the inputted data. Why else would there be a reference to the fact that the statistical information is "based on" the input data? Although only the input data themselves are transferred, the Board concluded that STATS Football "transferr[ed] statistical information based on such inputted data" as required by Claim 1.

The question to be answered is whether there is "statistical information" that is "based on" the input data when the untransformed data are transferred. The "input data" and the "statistical information" that is "based on" the input data are separately stated and presumptively different. For "statistical information" to be "based on" the input data, it must be transformed in some fashion. The Board did not required a transformation or identify any theory by which "statistical information" could be said to be "based on" the distinct "input data" when it is nothing more than the untransformed, unmodified data itself. The "statistical information" is "based on" the "input data," it is not the "input data."

The Board also agreed with an argument STATS made for the first time in its reply papers that "even if we were to accept Patent Owner's restriction on what qualifies as 'statistical information based on such inputted data,' STATS Football 'maintains a 'Game State' (e.g., 3rd and 5 from the team's own 27 yard line) that is calculated based on data input by the user (e.g., run for 5 yards).'" Final Written Decision at p. A28 (citing STATS Reply at pp. A553, A556-A557). This is not a correct understanding of the "Game State" aspect of STATS Football as it is described in the reference.

"Game State" is a feature of STATS Football that describes the current status of the game. For example, after a significant game event, such as an interception or kickoff, the user sets the "Game State" to reflect the position on the

field from which the first down will take place.  *See* STATS Football at pp. A208-A209 (following kickoff, "FB Live will ask which team returned the kick and the yards of the return. Then you will need to set the Game State"; upon an interception, "FB Live will ask for the passer on the play and the number of interception return yards. You will need to set the Game State to 1st and 10 and enter the correct field position.").  Game State sometimes is automatically updated by the software in response to other information being entered by the user.  *Id.* at pp. A207-A208 ("Lastly, you would choose the KICKOFF event.  FB Live will then ask you which team returned the ball.  Simply move the cursor, if necessary, to the correct team and hit <ENTER>. In this case, you would choose Buffalo. Now FB Live will update the GAME STATE, that is, down, yards to go, and field position in the left-hand corner.").

The Board suggests that updating a game clock or field position is "statistics based on such inputted data."  This is incorrect.  The elapsing of five seconds is very different from revised calculations of, for example, a batting average, average goals per game, average yards per run, or other common "statistics."  Maintaining the "Game State" as described in STATS Football is simply updating the current status of a particular game, not a calculation of "statistical information based on such inputted data."

Finally, the Board also pointed to Hockeyline's Canadian patent as supporting the conclusion that "statistical information based on such inputted data" is the same as "data related to events of said sports game."  While the Claim 1 of the '107 Patent claims "a processor," the Canadian patent claims "'a processor, said processor calculating statistical information based on inputted data.'"  Final Written Decision at p. A22 (citing Ex 1016, pp. A680, A715).  The Board stated that "[a]lthough the more limiting language in the Canadian claim is consistent with Patent Owner's argument here, that statistical information should be limited to statistics generated from calculations based on inputted data, the unadorned "a processor" language in the '107 patent is not."  *Id.*  While the Board noted that the claim in the Canadian patent (to which the ''107 Patent claims priority) is consistent with Hockeyline's interpretation of "statistical information based on such inputted data," the Board apparently found this to weigh against Hockeyline's interpretation.  This makes no sense.  At most, the claim in the Canadian patent speaks to how "a processor" might be construed (although that was not disputed).  It does not change the nature of "statistical information based on such inputted data."

## III.  HAMEEN-ANTTILA AND STATS FOOTBALL DO NOT DISCLOSE USER-CUSTOMIZABLE SCREENS.

The final element of Claim 1 is "wherein the display means displays a plurality of hierarchical menu-based screens that may be customized by the user to

reflect desired data that is to be gathered for said sports game." '107 Patent at 8:23-26. The Board separately construed "hierarchical menu-based screens" and "customized by the user to reflect desired data that is to be gathered for said sports game." The Board construed the latter as "any action by the user to configure the hierarchical menu-based screen displays to permit desired data to be gathered for one or more sports games." Final Written Decision at p. A12. Partly in reliance on its erroneous construction of the latter term, the Court incorrectly found that Hameen-Anttila and STATS Football anticipate Claim 1 of the '107 Patent.

### A. "Customized By The User" Requires User Modification Of Screens Displayed By The Device.

The device of Claim 1 includes a "display means" that "displays a plurality of hierarchical menu-based screens that may be customized by the user to reflect desired data that are to be gathered for said sports game." '107 Patent at 8:23-26. The Board construed "wherein the display means displays a plurality of hierarchical menu-based screens" as "wherein the touch screen, computer screen, or other electronic screen displays multiple images of data input options for sports game events, organized in a series of levels with different importance or status." Final Written Decision at pp. A8-A9. The "data input options for sports game events, organized in a series of levels with different importance or status" (the Board's construction of "hierarchical menu based screens") of Claim 1 must be

capable of being "customized by the user to reflect desired data that is to be

gathered for said sports game" (language from last element in Claim 1).

The Board construed "customized by the user to reflect desired data that is to

be gathered for said sports game" as "any action by the user to configure the

hierarchical menu-based screen displays to permit desired data to be gathered for

one or more sports games."  Final Written Decision at p. A12.[1]  The Board thereby

construed "customized by the user" as "any action by the user to configure."  This

was not a construction argued by STATS.  The Board did not explain why

"customize" is properly construed as "configure," or what it would mean to

"configure."

In its discussion of "customize," the Board cited to column 7 under the

"Application Setup" heading.  Final Written Decision at p. A10.  The relevant

discussion in column 7 provides:

_____

[1] In a footnote, the Board construed "said sports game" to mean "one or more sports games" on the basis that "a sports game" (which the Board describes as the antecedent in the preamble) should be construed as "one or more sports games." Final Written Decision at p. A10 n.8.  The Board's explanation does not make sense.  Even if "a sports game" in the preamble is properly interpreted as "one or more sports games," it does not follow that "said sports game" must also be interpreted as "one or more sports games."  Claim 1 states that the screens may be customized by the user to reflect desired data that is to be gathered for "said sports game."  "Said sports game" clearly refers to a single sports game, not multiple sports games.  The screens are customized for a particular game, not multiple games at the same time.  *In re Skvorecz*, 580 F.3d at 1267 .  While the Board's reasoning is flawed, the Board did not explain that this aspect of its claim construction was relevant to its patentability determination, and it is not clear that it is.

Application Setup

The Application button on the main menu will launch the Application Setup window. This screen will allow the user to configure which statistics are gathered by the electronic scorekeeping device. It will allow for the device to be configured in such a way as to gather either only a single statistic or multiple statistic types. For instance, in a system wherein a plurality of electronic scorekeeping devices are used, it is possible that only statistics relating to Shots will be gathered on a particular device.

'107 Patent at 7:43-57. The use of the term "configure" in this passage does not shed light on what it means to "configure" or "customize." To the extent "configure" is narrower or even different from "customize," it is improper to import such a meaning into the claim. *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998) ("a court may not import limitations from the written description into the claims").

In addition, "configure" is used in claims depending from Claim 1. Claim 3 (not at issue), which depends from Claim 2 and Claim 1, states that the "the user is able to configure the time interval between automatic transfers." '107 Patent at 8:29-30. "[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315. Dependent Claim 3 accordingly includes both "configure" and "customized," which therefore must carry different meanings. *Helmsderfer*, 527 F.3d at 1382; *CAE Screenplates*, 224 F.3d at 1317.

The Board's construction does not explain why the ordinary presumption would not apply or is overcome, or explain how its construction addresses the presumption that "configure" and "customize" have different meanings. The Board's construction improperly nullifies the term "configure" in Claim 3.

### B.    The Board's Invalidity Determination Cannot Stand Under A Proper Construction Of "Customized By The User."

#### 1.    Hameen-Anttila Does Not Disclose User-Customizable Screens.

Hameen-Anttila discloses a device that provides hierarchical menu-based screens that include a setup menu that allows a user to select a desired sport (*e.g.*, golf or hockey). Hameen-Anttila at 5:16-27. Once the user has selected the particular sport, a further screen appears that enables a user to enter sport-specific data. *Id.* Hameen-Anttila does not disclose any way for the user to alter, modify, or otherwise customize any of the screens presented to the user.

The Board found that selecting a sport on the first "setup" screen "discloses hierarchical menu-based screen displays that may be 'customized by the user to reflect desired data,' in accordance with our claim construction." Final Written Decision at p. A18 ("We agree with Petitioner, that the setup menu in Hameen-Anttila (Fig. 4a) allows a user to select desired display menus (e.g., for golf) that will cause other menus not to be displayed (e.g., for hockey, bowling, and baseball) during a user's input of golf-specific data in real time.").

Hockeyline submits that selection of a sport in a way that calls up a further screen is not an "action by the user to configure the hierarchical menu-based screen displays to permit desired data to be gathered for one or more sports games" (the Board's construction). Claim 1 requires a "display means" that "displays a plurality of hierarchical menu-based screens that may be customized by the user to reflect desired data that is to be gathered for said sports game." The screens that are applicable to a particular sports game are what must be customizable.

The Board's determination that Hameen-Anttila anticipates Claim 1 is not supportable. One does not customize a screen by selecting it from other possible screens. The Board rejected as "illusory and not consistent with the description of user customization in the '107 patent" the distinction between "customizing" screens by changing them and navigating through different screens by selecting different menu items. Final Written Decision at p. A19. The Board did not offer any explanation for how merely using screens by navigating through the hierarchy is within the broadest reasonable interpretation of "customized," and there is none. And the distinction between "customization" and "navigation" is anything but "illusory." Nothing is "configured" or "customized" by instructing the device to display predetermined screens applicable to a specific sport by navigating a hierarchy.

Perhaps recognizing that navigating from one screen to another via menu item selection is not "customizing" any screen, the Board points to purported "drop-down" arrows in Hameen-Anttila Figure 4a. Without citation to anything in the record, the Board asserts that the arrows in Figure 4a "suggest" the ability to customize a screen. Final Written Decision at p. A19 ("The individual drop-down arrows in Figure 4b further suggest the ability of a user to change the menu-based screen displays to permit the user to input desired data for the illustrated golf game."). STATS did not make this argument, and it therefore did not present any evidence that might provide a basis for it.

As suggested by the lack of citation to the patent or other evidence, Hameen-Anttila does not describe how any such "drop-down arrows" work to provide the user "the ability to change the menu-based screen displays," or even indicate that the Board has properly interpreted Figure 4a to include "drop-down arrows."

Referencing STATS's characterization of his deposition testimony, the Board also stated that Hockeyline's expert, Dr. Locke "agrees that choosing not to display a menu screen is a form of user customization." Final Written Decision at pp. A18-A19. This is not a fair characterization of Dr. Locke's testimony, or a fair application of it to Hameen-Anttila. Dr. Locke was asked whether removing a screen that would otherwise be applicable to a given sports game (such as a screen in which data on the circle in which a hockey face-off occurred was presented)

would be an act of "customization." Dr. Locke confirmed that it would be. This does not mean that selecting one sport from others, as is done through Hameen-Anttila's setup menus, is user customization of a screen or screens "to reflect desired data that is to be gathered for said sports game" as required by Claim 1. Dr. Locke addressed specific data for "said sports game," not the selection of a sports game other than "said sports game."

### 2. STATS Football Does Not Disclose User-Customizable Screens

For reasons analogous to Hameen-Anttila, STATS Football also does not disclose user-customizable screens. As the Board said, STATS Football discloses a program in which events in a football game can be recorded. Final Written Decision at p. A25. Users can record data in different roles, *e.g.*, as a "Head Scout," an "Assistant Scout," "Receiver Scout," or a "Running Back Scout." STATS Football at pp. A190-A191 § II; p. A206 ¶ 3. The software program ("KICKOFF") asks the user to record data that are applicable to the user's selected role. For example:

> KICKOFF will only ask for the specific information that each scout is required to track. For example, the Running Back Scout will only be asked for the formation, shotgun, play action and the number of broken tackles on the play above. The Receiver Scout will be asked for the direction of the play, roll out, and the yardline where the ball was caught. The Defensive Scout will be asked for defenders at the line, who was the defensive target, and

> blitz/hurry/knockdown information. The Head Scout will
> be prompted for every appropriate item for every play.

STATS Football at p. A206 ¶ 3.  The data entry options for the users will vary based on the role the user identifies for himself or herself during the startup process.  STATS Football at p. A207 § VII.B., item 7.

Like Hameen-Anttila, selection of a role in STATS Football is not customization by a user.  The KICKOFF software is programmed to present certain data fields to a user based on the role that the user selects.  Although the data fields may be different for one user in relation to another user who is identified with a different role, neither user has "customized" any screen in any way.  Each user has merely selected one of a number of role options, and is presented with the data entry options the software has been programmed to associate with that role.  STATS Football at p. A206 ¶ 3 ("KICKOFF will only ask for the specific information that each scout is required to track.  For example, the Running Back Scout will only be asked for the formation, shotgun, play action and the number of broken tackles on the play above.  The Receiver Scout will be asked for the direction of the play, roll out, and the yardline where the ball was caught.").  Unlike the examples in the '107 Patent, the user is not able to modify any of the screens presented.  STATS Football does not disclose a device with "hierarchical menu-based screens that may be customized by the user."  The Board's finding to the contrary was wrong.

### C.    Hockeyline's Interpretation Is Correct

Hockeyline proposed that "may be customized by the user to reflect desired data that is to be gathered for said sports game" should be construed according to its plain meaning as "may be customized, such as through modifications or changes, by the user so as to collect only specific data that the user desires to gather once the game begins."  Patent Owner's Response at p. A496.  Hockeyline's interpretation is consistent with the use of the term "customize" in Claim 1, and throughout the specification.  *See* '107 Patent at 8:23-26 ("wherein the display means displays a plurality of hierarchical menu-based screens that may be customized by the user to reflect desired data that is to be gathered for said sports game.").  The Board's criticisms of Hockeyline's position are without merit.

The Board stated that Hockeyline's interpretation did "not reflect the plain meaning of 'customize' or the broadest reasonable interpretation of the claim language at issue, but rather implies a limitation from the preferred embodiment that is not found in the claim language."  Final Written Decision at p. A11.  "In particular," the Board argued, "nothing in the language of claim 1 limits the actions of a user 'to collect only specific data that the user desires to gather once the game begins,' as argued by Patent Owner."  *Id.*

In order to "customize" something, it must be changed in some way. Hockeyline's interpretation, which explains how customization takes place, and to

what end ("through modifications or changes . . . to collect only specific data that

the user desires to gather once the game begins"), reflects the claim language

("customized . . . to reflect desired data that is to be gathered for said sports

game."). Unlike the Board's construction, Hockeyline's proposal does not bend

the claim language in a way that transforms "screens that may be customized by

the user to reflect data that is to be gathered for said sports game" to "any action by

the user to configure the hierarchical menu-based screen displays to permit desired

data to be gathered for one or more sports games." It is simply not true that

Hockeyline's interpretation has "no justification" in the claim language.

It is also plainly not true that Hockeyline's proposal improperly imports

"limitations" from the specification. The Board noted that both Hockeyline and

STATS pointed to the description of the "Application Setup" in column 7 in

discussing the meaning of "customizing" the "hierarchical menu-based screens."

Final Written Decision at A10. That description provides:

> Application Setup
>
> The Application button on the main menu will launch the Application Setup window. This screen will allow the user to configure which statistics are gathered by the electronic scorekeeping device. It will allow for the device to be configured in such a way as to gather either only a single statistic or multiple statistic types. For instance, in a system wherein a plurality of electronic scorekeeping devices are used, it is possible that only statistics relating to Shots will be gathered on a particular device. This setup will also allow the user to block out

> any sub-section of a statistic. For example, a team may
> want to keep track of face-offs won/lost, but not which
> circle it was in; the device, in this case, will not display
> that particular screen to the user and the statistics
> gathering process will therefore be streamlined.

'107 Patent at 7:43-57.  As described in this example, the '107 Patent contemplates

a device that enables "customization" of a screen by modifying a screen by

"blocking out" points for data entry in order to limit the statistics gathered by the

device.  By blocking out the "sub-sections" applicable to data for statistics that are

not of interest (such as win/loss rate in particular hockey face-off circles), the

screens can be customized so that only data necessary to desired statistics is

collected (such as the percentage of won and lost face-offs).

In contrast to the column 7 example, Hockeyline's interpretation does not

require that "customization" be limited to circumstances in which the user can

decrease the amount of data input options by, for example, "blocking out"

unwanted data fields.  Rather, consistent with the broadest reasonable

interpretation standard, Hockeyline's explanation of the language allows either a

greater or fewer number of data fields to be included in the menu-based display

screens to reflect the "specific data that the user desires to gather."  "Specific data

that the user desires to gather" is consistent with the claim language "desired data

that is to be gathered for said sports game," and is not limited to the described

embodiment which discusses only "blocking out" of data fields.  It is not true that

Hockeyline's seeks to import limitations from column 7, regardless of whether it would be proper to do so.

The Board also wrongly stated that Hockeyline's interpretation is not consistent with the "plain meaning" of "customize." The "plain meaning" of a term in a patent is the plain meaning of that term to a person having ordinary skill in the art. *Phillips*, 415 F.3d at 1313. Hockeyline's expert, Dr. Locke, explained that a person having ordinary skill in the art would understand the term "customize" as it is used in the '107 Patent to mean "capability for the user to actually change the menus to collect less (or perhaps more) data regarding a particular sport than the default menus provided on the practicing screens." Locke Decl. at p. A8520 ¶ 23; Final Written Decision at p. A9. Dr. Locke's description is consistent with the ordinary dictionary definition of "customization," which is "to change (something) in order to fit the needs or requirements of a person, business, etc." http://www.merriam-webster.com/dictionary/customize; Patent Owner's Response to Petition at p. A497 n.1.[2] STATS did not provide any evidence to the contrary.

---

[2] The Board commented that the web-link was "not filed as an exhibit in accordance with our rules. 37 C.F.R. § 42.6 (c)." Final Written Decision at p. A9 n.7. It is not clear from the footnote in the Final Written Decision whether the Board declined to consider the definition, and if it declined, whether it did so because a print out of the dictionary entry was not filed as an exhibit. The Federal Register section the Board cited does not state that a citation such as that provided

The Board gave "no weight" to Dr. Locke's testimony regarding how one of ordinary skill in the art would understand "customize" as it is used in Claim 1 because, the Board stated, neither he nor Hockeyline explained "how a user could modify the menu-based screen displays to gather 'more' data without re-programming the device."  Final Written Decision at p. A12.  That rationale would not justify giving "no weight" to Dr. Locke's testimony that one of ordinary skill would understand "customize" "to collect less . . . data regarding a particular sport than the default menus provided on the practicing screens," a construction to require the rejection of the Board's conclusion, and its criticism of "(or perhaps more") aspect of Dr. Locke's testimony is unfounded.

Hockeyline's interpretation, as confirmed by Dr. Locke's testimony, does not require that the user be able to modify the screen displays to gather "more" data.  This was not an argument raised by STATS, but it is not difficult to imagine how the device could provide user customizable screens that would allow the collection of "more" data without reprogramming the device.

For example, a menu-based display screen could include a default set of "data input options," as well as options for more advanced "data input options" that the user could select through a check box or radio button.  Elaborating on the example described in column 7, a default screen in a hockey game application

---

by Hockeyline must be filed as an exhibit.  In any event, the dictionary definition is a standard one, and is properly the subject to judicial notice.

might include options for recording data on face-offs, including "data input

options" that allow a user to record the team that won a face-off and in which

circle the face-off occurred.  The screen could also include a check box for more

advanced "data input options," such as whether the centerman for each team is left-

handed or right-handed, or the period in which the face-off occurred.  As stated in

the example in column 7, the user could "block out" the data input options for the

circle in which the face-off took place to collect less information about the game.

Conversely, the user could check the box for more advanced data input options,

thus bringing up additional data input options to record information about right- or

left-handedness.  This would result in customization in which "more" data could be

captured through the menu-based screens, and there is nothing in the record that

would provide a basis for a conclusion that user reprogramming would be required

to implement this solution.

The Board also suggested that Hockeyline's interpretation improperly

sought to "import" a preferred embodiment from the specification, and referenced

a discussion at column 7.  Unlike the Board's construction, there is no aspect of the

description in column 7 that Hockeyline suggested that is not supported by the

claim language.

The Board also relied on two additional arguments that STATS made for the

first time at the oral hearing.  The Board stated that Hockeyline "also does not take

into account the more limiting wherein clause of claim 16 or the broader

description of customization in column 5, which describes 'modifying the displays

on the device' to permit a user to score one or more sports games from a

programmed list, such as 'softball, soccer, baseball, basketball, and football.'"

Final Written Decision at A11, pp. A12.

The statement in column 5 is a sentence within a paragraph describing an

embodiment of the invention, and how it can be used to record data and produce

statistics for sports other than hockey:

> In accordance with an embodiment of the present invention, the collection and computation of a wide range of data and statistics related to a sports game are enabled. Although the remaining description of this embodiment of the present invention will be described in detail with respect to the game of hockey, it should be noted that data related to other sports may also be recorded, and statistical information can be processed and transmitted using this device. ***For example, sports such as softball, soccer, baseball, basketball, and football, can be scored by modifying the displays on the device as well as the software which provides the prompts and system options to the user.*** Simple equations and relationships for statistics relating to other sports are readily obtainable and the device or system of the present invention may easily be modified to accommodate these changes.

'107 Patent at 5:31-47 (emphasis indicating sentence cited by the Board); Final

Written Decision at pp. A11-A12. The Board relies on the sentence emphasized

above for the proposition that "customization" can refer not only to the

modification of individual screens, but also to the selection of a specific game type

-37-

for which data might be recorded (i.e., softball, soccer, baseball, etc.).  The Board misunderstood the passage in column 5.

Claim 1 requires screens that may be customized by the user "to reflect desired data that is to be gathered for said sports game."  The paragraph in column 5 on which the Board relied states that the invention can used with games other than hockey, if, through different programming, embodiments suited to the other games are created.  *See* 107 Patent at 5:31-47 ("by modifying the displays on the device as well as the software which provides the prompts and system options to the user").  The passage simply and routinely explains that, while the specification will describe the invention in the context of a hockey game, the invention is not limited to hockey.  Hockey is used to describe an embodiment, but "data related to other sports may also be recorded, and statistical information can be processed and transmitted using this device" through embodiments based on other sports.  Once an embodiment involving a given sport is created "by modifying the displays . . . as well as the software," and the sport is selected, the user may "customize" or "modify" one or more menu-based display screens pertaining to that sport.  The column 5 argument that STATS raised for the first time at the hearing should not have been considered by the Board, *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1273 (Fed. Cir. 2002) (party fails to preserve an issue for appeal when it is not properly raised in the tribunal below); *Universal Remote Control,*

*Inc. v. Universal Electronics, Inc.*, IPR2013-00127, 2014 WL 2995051, at *13 (June 30, 2014) ("We do not consider arguments advanced for the first time at a trial hearing because to do otherwise would be prejudicial to the other party (or parties)."), but it does not provide a basis for rejecting Hockeyline's construction.

The Board also mistakenly stated that Hockeyline's interpretation of "customized" did not "take into account" two "wherein" clauses in Claim 16. In summarizing another argument STATS raised for the first time at the hearing, the Board stated that Claim 16 contains two "wherein" clauses "directed to user customization." Final Written Decision at p. A11. According to the Board, the first wherein clause of Claim 16 is "very similar to the wherein clause of Claim 1," and the second wherein clause of Claim 16 "adds a limitation that corresponds to the preferred embodiment, where a user blocks out unselected menus to be able to input only specific desired data." *Id.* To accept Hockeyline's interpretation of customization would be to "read into" Claim 1 the more limited second wherein clause of Claim 16. The Board misread Claim 16.

Claim 16 relates to a system claim that includes a "scorekeeping device" and other elements, such as a central database. *See* 107 Patent at 9:17-43. The two wherein clauses appear in a description of the "scorekeeping device" portion of the claim. *Id.* The two wherein clauses of Claim 16 read as follows:

> wherein the display means displays a plurality of hierarchical ***menu-based screens that are customized*** to

> reflect the desired data that is to be gathered for said
> sports game; and
>
> wherein *the user is able to further customize the menu
> based screens* in order to determine which specific data
> is to be collected at said sports game.

'107 Patent at 9:37-43 (emphasis added).

The first wherein clause refers describes the menu-based screens as "customized to reflect the desired data that is to be gathered for said sports game," but it does not say anything about user customization. The second wherein clause provides that "the user" may "further customize the menu based screens in order to determine which specific data is to be collected at said sports game." The menu-based screens are "customized" for a particular sports game, as in the basic programming of the system, and may be further customized by a user to determine particular data to be collected, as provided in the invention. The Board's comment that the first wherein clause of Claim 16 is "very similar" to the wherein clause of Claim 1 ignores the plain difference between the two. The second wherein clause of Claim 16, like the wherein clause of Claim 1, indicates that the user can "customize" the screens to collect only desired, or specific, data. The "further customization" that is described is like the customization of Claim 1, and it does not provide any support for STATS's other belated argument. Hockeyline's construction is entirely consistent with Claim 16. STATS' last minute attempt to recover from the discrediting of the arguments on which its petition was based

should not have been considered by Board, *Novosteel SA*, 284 F.3d at 1273;

*Universal Remote Control,* IPR2013-00127, 2014 WL 2995051, at *13, and it

provides no support for the plainly incorrect construction adopted by the Board.

## IV.    CONCLUSION.

The Board's construction of Claim 1 was erroneous.  The Board's finding that

claims 1, 2, 8, 10, 11, 12 and 30 are unpatentable in light of Hameen-Anttila and

STATS Football should be reversed.


Dated:  March 18, 2016                    FREITAS ANGELL & WEINBERG LLP

                                    _____*/s/Jason S. Angell*_____
                                         Robert E. Freitas
                                         Jason S. Angell
                                         Daniel J. Weinberg

                                         Attorneys for Appellant
                                         Hockeyline, Inc.

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that the Appellant's Opening Brief is proportionally spaced, in a typeface of 14 points or more and contains 8,384 words, exclusive of those materials not required to be counted under Rule 32(a)(7)(B)(iii).

*/s/Jason S. Angell*
Jason S. Angell

## CERTIFICATE OF SERVICE

It is certified that copies of the foregoing has been served via electronic

transmission addressed to the persons at the address below:

David M. Airan
Aaron R. Feigelson
Wesley O. Mueller
LEYDIG, VOIT & MAYER, LTD.
dairan@leydig.com
afeigelson@leydig.com
wmueller@leydig.com

Date:  March 18, 2016                    */s/Jason S. Angell*
                                         Jason S. Angell

## ADDENDUM

Final Written Decision on September 15, 2015

United States Patent 6,725,107 B2